FILED
2022 Sep-23  PM 01:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **HEATHER MOORE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:20-cv-01980-AMM** |
| | ) |
| **SOCIAL SECURITY** | ) |
| **ADMINISTRATION,** | ) |
| **COMMISSIONER** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OF DECISION

Plaintiff Heather Moore brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits") and supplemental security income. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On September 24, 2018, Ms. Moore protectively filed an application for benefits under Title II of the Act, alleging disability as of July 27, 2017. R. 26, 69–80, 172–78. Also on September 24, 2018, Ms. Moore protectively filed an application for supplemental security income under Title XVI of the Act, alleging

disability as of July 27, 2017. R. 26, 81–92, 166–71. Ms. Moore alleges disability due to bipolar disorder, memory issues, and panic attacks. R. 70, 82. She has at least a high school education, is able to communicate in English, and has past relevant work experience as a cashier II, receptionist, and waitress. R. 35, 62.

The Social Security Administration ("SSA") initially denied Ms. Moore's applications on October 17, 2018. R. 26, 69–92, 97–107. On November 15, 2018, Ms. Moore filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 26, 109–10. That request was granted. R. 111–16. Ms. Moore received a hearing before ALJ Lisa M. Johnson on October 17, 2019. R. 26, 42–66. On April 29, 2020, ALJ Johnson issued a decision, finding that Ms. Moore was not disabled from July 27, 2017 through the date of her decision. R. 23–37. Ms. Moore was forty years old at the time of the ALJ decision. R. 35–37.

Ms. Moore appealed to the Appeals Council, which denied her request for review on October 6, 2020. R. 1–3. After the Appeals Council denied Ms. Moore's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On December 10, 2020, Ms. Moore sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.   The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. §§ 404.1520, 416.920. *First*, the ALJ must determine whether the claimant

is engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If such criteria are met, the claimant is declared disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. In the *fourth* step, the ALJ

determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c), 416.920(g)(1), 416.960(c).

The ALJ determined that Ms. Moore met the insured status requirements of the Act through December 31, 2017. R. 27, 29. Next, the ALJ found that Ms. Moore had not engaged in substantial gainful activity since her alleged onset date. R. 29. The ALJ decided that Ms. Moore had the following severe impairments: bipolar disorder, amphetamine use disorder, and personality disorder. R. 29. The ALJ determined that Ms. Moore did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed

impairments" to support a finding of disability. R. 29. The ALJ also determined that "[t]he severity of [Ms. Moore's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.08." R. 29.

The ALJ found that Ms. Moore's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 32. The ALJ found that Ms. Moore had the "residual functional capacity to perform a full range of work at all exertional levels" with certain nonexertional limitations. R. 31. The ALJ determined that Ms. Moore could: understand, remember, and carry out simple tasks; maintain attention and concentration for two-hour periods at a time; have occasional interaction with the general public; adapt to routine and infrequent work place changes; perform jobs that do not require working in tandem with coworkers; and perform jobs that do not require a production rate or pace. R. 31. The ALJ also determined that Ms. Moore would be able to make simple work-related decisions. R. 31.

According to the ALJ, Ms. Moore was "unable to perform any past relevant work." R. 35. According to the ALJ, Ms. Moore is "a younger individual," and she has "at least a high school education," as those terms are defined by the regulations. R. 35. The ALJ determined that "[t]ransferability of job skills is not material to the

determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 35. Because Ms. Moore's "ability to perform work at all exertional levels has been compromised by nonexertional limitations," the ALJ enlisted a vocational expert to ascertain "the extent to which these limitations erode the occupational base of unskilled work at all exertional levels." R. 36. That expert testified that such individual "would be able to perform the requirements of representative occupations such as laundry worker, . . . hand packager, . . . and cleaner." R. 36, 63.

Based on these findings, the ALJ concluded that Ms. Moore did not have a disability as defined in the Act, from July 27, 2017 through the date of the decision, April 29, 2020. R. 27, 36–37. Ms. Moore now challenges that decision.

### III. Factual Record

Before the alleged onset date, Ms. Moore was treated for mental health issues by the Chilton Shelby Mental Health Center, both while she was in custody at the Shelby County Jail and later when she was living with her mother. R. 269–96, 308–21, 339–42.

On August 8, 2017, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 343. She had appropriate appearance and affect and normal orientation, but her mood was anxious and she was restless. R. 343. The visit notes indicate that

Ms. Moore was "extremely loopy and bizarre in behavior" and "hyperverbal" with "exaggerated" movements, but that she believed "her medications are work[ing] effectively together." R. 343. On August 11, 2017, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 323. The medical records indicate that at the time she was experiencing "marginal stability on current regimen" of Lamictal and Risperidone. R. 323. At the visit, Ms. Moore had a disheveled appearance, pressured speech, no deficits in orientation or memory, irritable mood and affect, short attention span, and expansive/paranoid thought content. R. 323. She also reported hearing running water at night and demonstrated poor insight and judgment. R. 324. The visit notes indicate that Ms. Moore was receiving "poorly coordinated" care of her mental health and pregnancy. R. 326.

On October 20, 2017, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 344. She had appropriate appearance and affect and normal orientation, but her mood was anxious. R. 344. The visit notes indicate that Ms. Moore had left the Lovelady Center "against" clinical advice. R. 344. The notes also state that Ms. Moore "appeared remarkably clear-headed and reportedly compliant with meds this time. Risperdal works really well for her. No impact from Vistaril yet." R. 344.

On November 3, 2017, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 346. She had appropriate appearance and affect and normal

orientation, but her mood was anxious and euthymic. R. 346. The visit notes indicate that Ms. Moore was in a "happy mood and mildly anxious." R. 346. The visit notes also state that Ms. Moore was experiencing a "[s]ignificant reduction in panic attacks and no [substance abuse], especially while now in treatment at Alethcia House." R. 346.

On January 8, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center "for updated assessment and treatment plan." R. 298, 364. She was currently being treated with Risperdal and Celexa. R. 301, 367. She reported "that she has experienced new drug charges this past year, she blames this on becoming 'manic' August 2017 when taken off her medications during her pregnancy." R. 305, 371. After being put back on her medication, she reported having "greater stability." R. 305, 371. The visit notes recommend that Ms. Moore be treated with psychiatric appointments, medication monitoring, mental health consultation, individual/group psychotherapy, and crisis intervention as needed. R. 306, 372.

On February 23, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center after having her baby. R. 327, 398. She reported sleeping ok, taking Risperdal, no longer being manic, but feeling more anxious. R. 327, 398. Her appearance was appropriate, as was her mood, affect, and attention. R. 327, 398. She had normal speech, no deficits in orientation or memory, fair insight and judgment, but obsessive thought content. R. 327, 398.

On March 1, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 347. She had appropriate appearance and affect and normal orientation, her mood was euthymic, and she was calm. R. 347. The visit notes indicate that Ms. Moore stated she was compliant with her medication with no side effects. R. 347.

On March 14, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center for a medication check. R. 330, 401. She reported that the olanzapine had not been effective and caused her to feel irritable and angry. R. 330, 401. She also reported stopping Zyprexa. R. 330, 401. Her appearance, mood, and affect were appropriate, she showed no deficits in orientation or memory and fair insight and judgment, though she was distractible and obsessive. R. 330–31, 401–02. Her medications were tweaked and she was advised to have her levels checked in two weeks. R. 331, 402.

On July 10, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 333, 404. She was "slightly less manic," but reported that she was unable to tolerate Tegretol. R. 333, 404. She reported that she continued to take Risperdal, though she forgot to take it sometimes. R. 333, 404. The medical notes indicate a recent incarceration. R. 333, 404. Ms. Moore was disheveled with pressured speech, and though she showed no deficits in orientation and memory, she was volatile, labile, distractible, and compulsive, with poor insight and judgment. R. 333–34,

404–05. The notes indicate that she was not compliant with medications, and she agreed to start injections. R. 334, 405.

On August 14, 2018, Ms. Moore presented to Brookwood Medical Center complaining of short-term memory loss after a Vega injection. R. 259–60. A CT scan was completed that was negative, and the medical records state the results "very strongly suggest" the memory loss is a result of medications. R. 263, 265.

On August 23, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 349. She had appropriate appearance and affect, euthymic mood, normal orientation, and was calm. R. 349. The visit notes indicate that Ms. Moore presented in a "slightly manic mood and her mother reports that her mania has been increasing for the last 2–3 days." R. 349. While her mood has been stable, "[s]he is not taking medications as prescribed due to her reactions since receiving Invega shot on 7/17/18." R. 349.

On August 31, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 336, 407. The notes indicate that she initially did well with the injection, but then became confused and psychotic with racing thoughts. R. 336, 407. Ms. Moore was doing better since restarting the oral Risperdal. R. 336, 407. While Ms. Moore reported that her thoughts were still racing and she was having trouble communicating, her mother reported she was sleeping and doing better with her memory. R. 336, 407. Her appearance and speech were normal, she showed no

deficits in orientation or memory, she was not manic, she was confused, she had a short attention span, she did not have paranoia, and her insight and judgment were fair. R. 336–37, 407–08.

On September 20, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 350. She had appropriate appearance and affect, normal orientation, and was calm, but her mood was anxious. R. 350. The visit notes indicate that Ms. Moore "presented slightly anxious," but she was responding well to Risperdal. R. 350.

On September 28, 2018, Ms. Moore presented to the Chilton Shelby Mental Health Center. R. 410. The visit notes indicate that Ms. Moore "is doing better" with no episode or evidence of mania. R. 410. She had appropriate appearance, affect, and thought content, normal speech, no deficits in orientation or memory, euthymic mood, a short attention span, and fair insight and judgment. R. 410–11.

Ms. Moore's mother completed a function report on October 18, 2018. R. 211–18. In it, she reported that Ms. Moore gets her two children ready for daycare by feeding and clothing them, cleans the kitchen and does laundry, and tends to her children at night. R. 211. She reported that Ms. Moore has trouble remembering how to perform tasks and that the medication causes drowsiness. R. 212. While she reported that she had to remind Ms. Moore to take her medicine, Ms. Moore was able to clean, do laundry, wash dishes, mow the lawn, and cook simple meals. R.

11

213. She reported that Ms. Moore did not go out alone, but was social with family, activities, and social media. R. 214–15. She reported that Ms. Moore had trouble with memory, completing tasks, concentration, understanding, and following instructions, and that they had not had much success getting Ms. Moore's bipolar disorder under control with medications. R. 216, 218.

Ms. Moore also completed an adult function report on October 18, 2018. R. 219–26. She reported the same activities as her mother – namely, getting her children ready for daycare, washing dishes, doing laundry, cooking dinner, and getting her children ready for bed. R. 219. She also reported that her medications make her sleep, and that she needs reminders on taking her medication. R. 220–21. She reported that she was only social with her family and cannot go places alone. R. 223–24. She reported that she had trouble with memory, completing tasks, concentration, understanding, and following instructions. R. 224.

On February 5, 2019, Ms. Moore presented to the Chilton Shelby Mental Health Center for an "updated assessment and treatment plan." R. 374. She reported taking her current medications as prescribed. R. 378. She also reported "continued struggles with mental health and trouble with substance abuse and charges" and "struggles with moods and controlling emotions." R. 379. At the time, Ms. Moore was living at the Lovelady Center. R. 380.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. §§ 405(g), 1383(c)(3); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. §§ 405(g), 1383(c)(3). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims],

it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

**V.    Discussion**

Ms. Moore alleges that the ALJ's decision should be reversed because the ALJ failed to "properly evaluate the opinion evidence" and failed "to evaluate whether Ms. Moore meets or equals the requirements under Listing 12.04." Doc. 16 at 1.

**A. The ALJ's Treatment of Medical Opinions**

Ms. Moore argues that with respect to medical opinions, the ALJ's decision misrepresented the record and is not supported by substantial evidence. *Id.* at 11. Ms. Moore points to the medical opinion of a consultative examiner, Dr. Velda Pugh, and her opinion finding "marked limitations in several areas of functioning." *Id.* at 11–12. Ms. Moore argues that Dr. Pugh's medical opinion is contrary to the ALJ's statements that "no treating, examining, or reviewing doctor has indicated that the claimant was disabled or otherwise unable to perform work related activities" and "despite any of her mental impairments the evidence of record fails to show extreme or marked limitations in understanding, remembering, applying information;

14

interacting with other; in concentrating, persisting, or maintaining pace; or in adapting or managing oneself." *Id.* at 11; R. 32, 34.

As acknowledged by Ms. Moore, the SSA has revised the applicable regulations. *See* Doc. 16 at 12 & n.2. The SSA's new regulations, promulgated in 2017, do away with the hierarchy of medical opinions and the treating source rule. 20 C.F.R. § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id*. And the ALJ "will articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* at § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* at § 404.1520c(c). It is not improper for an ALJ to consider a claimant's daily activities when evaluating a medical opinion. *See id.* at § 404.1520c(c)(5) (stating that an ALJ

may consider any other relevant factors "that tend to support or contradict a medical opinion"). Supportability and consistency are the most important of the five factors, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] . . . decision." *Id.* at § 404.1520c(b)(2). The ALJ may explain how she considered the remaining factors, but she is not required to do so. *Id.*

Dr. Pugh completed a psychiatric examination on January 25, 2020 for the Alabama Disability Determination Service. R. 414–18. Ms. Moore "describe[d] symptoms of sleep disturbance, depressed and manic moods, difficulty concentrating, irritability and impulsive behaviors." R. 414. She reported that she received "outpatient psychiatric treatment at Chilton-Shelby Mental Health Center every 2–3 months" and saw a therapist monthly. R. 414. Dr. Pugh noted that the medical records from the Chilton Shelby Mental Health Center indicate diagnoses of Bipolar I Disorder, Stimulant Use Disorder in sustained remission from Amphetamine-type substance, and Unspecified Personality Disorder. R. 414. Ms. Moore "admit[ted] to a history of using amphetamines up until a year ago" and stated "that she has been involved with drug rehabilitation at the Lovelady [Center] for the past year." R. 414.

Dr. Pugh summarized Ms. Moore's mental status in part as: cooperative, alert, coherent, with an "up and down" mood. R. 415. Dr. Pugh stated that the prognosis

for Ms. Moore was "marginal given her psychiatric difficulties and substance abu[]se." R. 415. Dr. Pugh opined that Ms. Moore's ability to understand, remember, and carry out instructions was not affected by her impairments. R. 416. Dr. Pugh opined that Ms. Moore's ability to interact appropriately with supervision, co-workers, and the public and respond to changes in the routine work setting was markedly affected by her impairments. R. 417. Dr. Pugh opined that Ms. Moore's ability to concentrate, persist, or maintain pace and ability to adapt or manage herself was not affected by her impairments. R. 417.

The ALJ considered Dr. Pugh's medical opinion and discussed it thoroughly in her decision. R. 30, 34. The ALJ discussed it in her analysis of listed impairments as follows:

> Dr. Pugh noted the claimant was casually dressed and groomed. She noted she was cooperative and alert. Her affect was appropriate. She had no difficulty subtracting serial 7's from 100 and her immediate recall was 2/3 after five minutes. Dr. Pugh noted the claimant was able to describe her activities on the previous day. Her remote recall seemed intact. Dr. Pugh noted the claimant did not exhibit any loose associations, tangential or thinking. She noted the claimant's daily activities included getting up at 6 am, getting her son ready for school, making lunches[,] taking children to school, doing household chores, picking up children from school and going to bed. She diagnosed bipolar disorder, amphetamine use, in remission and history of personality disorder. Dr. Pugh stated that the claimant's ability to understand, remember and carry out instructions was not affected by her impairment. . . . She thought the claimant was markedly limited in her ability to interact appropriately with the public, supervisors, co-

> workers, and respond appropriately to usual work situations and to changes in routine work setting. Dr. Pugh did not think the claimant's other abilities, such as the ability to concentrate, persist or maintain pace and the ability to adapt or manage oneself, were affected by the claimant's impairments. Dr. Pugh noted that if the claimant continued use of amphetamines, then it could exacerbate her bipolar symptoms. She thought the claimant could manage her benefits in her own interest.

R. 30 (internal citations omitted). The ALJ also discussed it in her residual functional capacity findings as follows:

> The undersigned has found the opinion of the examining consultative psychiatrist, Dr. Pugh, somewhat persuasive. Her opinion regarding responding to usual work situations and to changes within a routine work setting is contradicted by the claimant's treatment notes. Apparently at the time of the alleged onset date, the claimant was also the primary caretaker for her children. She prepared their meals, gets them dressed for school, drives them to school, and provides for their general care. The claimant's medications appear[] to be effective in stabilizing her severe impairments. The record establishes that she continues to have symptoms, but they are not disabling when the claimant is compliant with her medication and not using methamphetamines.

R. 34 (internal citations omitted).

As an initial matter, the ALJ articulated how persuasive she found the opinion, as required by the regulations. *See* 20 C.F.R. § 404.1520c(b). The ALJ considered the medical opinions "in accordance with 20 CFR 404.1520c." R. 33. Additionally, she stated: "The undersigned fully considered the medical opinions . . . in this claim." R. 33. The ALJ wrote that any discrepancies between the medical opinions and the

limitations in Ms. Moore's residual functional capacity "are based on [her] independent review, [her] consideration of the claimant's testimony and other evidence from the hearing, and all other evidence in the claim." R. 33.

Ms. Moore appears to argue that there is an inconsistency between the finding that Dr. Pugh's opinion is "somewhat persuasive" and the finding that the marked limitations are contradicted by the medical record. Doc. 16 at 13. However, the ALJ cited Ms. Moore's treatment notes, her daily activities, and the effectiveness of her medication when articulating the persuasiveness of Dr. Pugh's medical opinion. R. 34.

The ALJ applied the correct legal standards in evaluating Dr. Pugh's opinion, and substantial evidence supports her finding. *See* R. 34. Ms. Moore's treatment notes from the Chilton-Shelby Mental Health Clinic indicated that Ms. Moore's symptoms were well controlled when she consistently took her medication. R. 34, 305, 336, 344, 346–47, 350, 371, 378, 410. Additionally, Ms. Moore's daily activities as reported to Dr. Pugh, R. 415, in her adult function report, R. 219–26, and by her mother, R. 211–18, all demonstrate her ability to care for her children. Finally, though Dr. Pugh's opinion found no limitations to understanding, remembering, carrying out instructions, concentrative, persisting or maintaining pace, and adapting or managing oneself, the ALJ also included in the residual functional capacity limitations to simple tasks, two-hour periods of concentration,

jobs that do not require a production rate or pace, and to simple work-related decisions. *See* R. 31. Ms. Moore has not shown that the ALJ erred in her consideration of Dr. Pugh's psychiatric examination.

### B. The ALJ's Evaluation of Listing 12.04

Ms. Moore next contends that the ALJ should have found that her mental impairments met Listing 12.04 (affective disorders). Doc. 16 at 16. Specifically, Ms. Moore argues that the ALJ erred when "finding only moderate limitations" because the ALJ "cites generally to the record with the same citation . . . and picks and chooses evidence to support her findings." *Id.* at 17. Ms. Moore argues that she "satisfies the first prong of Listing 12.04(A)(2) for bipolar disorder by medical documentation of her chronic sleep disturbance, distractibility, and involvement in activities that have a high probability of painful consequences." *Id.* at 18. She also argues that she "satisfies the second prong of 12.04 by having marked limitations in interacting with others and adapting or managing oneself." *Id.*

To establish a presumption of disability based upon a listing at step three, a claimant must show "a diagnosis included in the Listings and must provide medical reports documenting that the conditions met the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002); *see also* 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926. Additionally, a claimant's impairments must meet or equal *all* of the specified medical criteria in

a particular listing for the claimant to be disabled at step three. *Sullivan v. Zebley*, 493 U.S. 521, 530–32 (1990). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531.

Listing 12.04 addresses depressive, bipolar, and related disorders, and is satisfied by A and B, or A and C:

> A. Medical documentation of the requirements of paragraph 1 or 2:
>
> 1. Depressive disorder, characterized by five or more of the following: a. Depressed mood; b. Diminished interest in almost all activities; c. Appetite disturbance with change in weight; d. Sleep disturbance; e. Observable psychomotor agitation or retardation; f. Decreased energy; g. Feelings of guilt or worthlessness; h. Difficulty concentrating or thinking; or i. Thoughts of death or suicide.
>
> 2. Bipolar disorder, characterized by three or more of the following: a. Pressured speech; b. Flight of ideas; c. Inflated self-esteem; d. Decreased need for sleep; e. Distractibility; f. Involvement in activities that have a high probability of painful consequences that are not recognized; or g. Increase in goal-directed activity or psychomotor agitation.
>
> AND
>
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

The ALJ found that Ms. Moore's mental impairments "do not meet or medically equal the criteria of listing[] 12.04." R. 29. To make this determination, the ALJ analyzed whether the "paragraph B" criteria were satisfied. R. 29. The ALJ found that Ms. Moore had moderate limitations in: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. R. 29–30. The ALJ also

determined that "the evidence fails to establish the presence of the 'paragraph C' criteria." R. 31.

Substantial evidence supports the ALJ's finding that Ms. Moore did not meet this listing. *See* R. 29–31. *First*, Ms. Moore's argument regarding "paragraph A" is irrelevant because the ALJ based her listing decision on the "paragraph B" and "paragraph C" criteria. R. 29–31. *Second*, with respect to Ms. Moore's "paragraph B" arguments, substantial evidence supports the ALJ's decision that Ms. Moore had only moderate limitations in the "paragraph B" criteria. In making this determination, the ALJ cited both Ms. Moore's and her mother's adult function reports, which both indicated that Ms. Moore was caring for her children, doing chores (including dishes, cooking, laundry, and mowing the lawn), and participating in social activities. *See infra* Section III; R. 211–26. The ALJ also cited the evaluation from Dr. Samuel Williams, a state agency psychiatrist who assessed Ms. Moore with moderate limitations in all criterion. R. 29–31. Additionally, as noted above, the ALJ cited Dr. Pugh's medical opinion in her listing determination. *See infra* Section V.A; R. 29–30. The ALJ acknowledged that Dr. Pugh "thought [Ms. Moore] was markedly limited in her ability to interact appropriately with the public, supervisors, co-workers, and respond appropriately to usual work situations and to changes in routine work setting." R. 30. However, the ALJ examined "the record as a whole," including Dr. Pugh's entire medical opinion, Dr. Williams's assessment,

23

the adult function reports, and the medical evidence of record to determine that Ms. Moore did not have marked limitations. R. 29–31. *Finally*, Ms. Moore does not challenge the ALJ's "paragraph C" determination. The ALJ's finding at step three is supported by substantial evidence.

## VI.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 23rd day of September, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE